# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-2873
_____

United States of America

*Plaintiff - Appellee*

v.

Christina Barrera

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: June 13, 2024
Filed: August 14, 2024
_____

Before COLLOTON, Chief Judge, MELLOY and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Christina Barrera appeals the district court's sentence requiring her to pay restitution to private health and disability insurers after she was found guilty of conspiring to defraud the Social Security Administration. *See* 18 U.S.C. § 371. We affirm in part, vacate in part, and remand.

## I.

For ten years, Christina Barrera was the office manager at PowerMed. PowerMed was a small chiropractic clinic that engaged in a fraudulent scheme to assist unqualified individuals, mainly employees of Anheuser-Busch InBev ("AB InBev"), in obtaining disability benefits from the Social Security Administration ("SSA") and a variety of private insurers. In addition to disability benefits, AB InBev employees who fraudulently represented themselves as "totally and permanently disabled" for twelve months could receive an immediate payout of $100,000 under a group life insurance policy that AB InBev purchased on behalf of its employees from Prudential Insurance.

To fraudulently obtain these benefits, patients made a cash payment to PowerMed of $21,600 for its "disability package." The disability package included a battery of unnecessary medical tests and treatments to build a false paper trail. It also included assistance fraudulently applying for both short- and long-term disability benefits from private insurers and the SSA. Barrera completed the initial intake of disability package patients and explained to them how the scheme would work and what they would pay. She also helped patients complete disability paperwork and coached them on how to fraudulently represent themselves as eligible for benefits. When an undercover officer posed as a new disability package patient, Barrera explained to him that unnecessary medical treatments increased the likelihood of getting disability benefits and warned him not to post anything online that would indicate he was not in fact disabled.

The undercover operation led to the indictment of Barrera and other participants in the scheme. Barrera went to trial, and a jury found her guilty of conspiracy to defraud the SSA but acquitted her on the other charges against her—health care fraud and theft of government funds.

Before sentencing, the probation office prepared a presentence investigation report ("PSR") that calculated the total estimated loss caused by the conspiracy at

more than $4,000,000. It is undisputed that Barrera can be required to pay restitution only for the losses stemming from the assistance she provided to three specific patients who fraudulently obtained disability benefits through the scheme. The PSR recommended that because Barrera was only convicted of conspiracy to defraud the SSA, she be ordered to pay $339,407.80 in restitution, the amount that the SSA had paid to the three patients Barrera assisted. The Government objected to this recommendation and argued that Barrera should also be required to pay restitution to the private insurers who had paid for unnecessary medical treatments and fraudulent disability benefits for the three patients Barrera had assisted. The PSR had calculated these losses, but the Government included its own loss calculation in its objection:

| | Anthem | United | Cigna | Prudential | MetLife | Total |
|---|---|---|---|---|---|---|
| Government | $2,690.54 | $402.08 | $40,156 | $100,000 | $60,659 | $203,907.62 |
| PSR | $9,659.54 | $402.08 | $40,156 | $75,086.30 | $38,020 | $163,323.92 |
| Difference | -$6,969 | $0 | $0 | $24,913.70 | $22,639 | $40,583.70 |

At sentencing, the Government confused these two calculations and incorrectly told the district court that "in the presentence investigation report, the total amount [of private insurer losses] is $203,907.62," rather than the actual PSR calculation of $163,323.92. Barrera's counsel did not correct this misstatement, although he had earlier stated that he "agree[d] with the amount [of restitution] established in the presentence report." After confirming with the Government that the PSR's restitution calculation was the incorrectly stated $203,907.62, the district court sustained the Government's objection, adopted the Government's figures for the private insurers without explanation, and ordered Barrera to make joint and several restitution of $339,407.80 to the SSA, $2,690.54 to Anthem Blue Cross Blue Shield, $402.08 to United Healthcare, $40,156 to Cigna Health, $100,000 to Prudential Insurance, and $60,659 to MetLife—for a total restitution amount of $543,315.42.

After Barrera's sentencing, the district court sentenced one of her co-conspirators: Clarissa Pogue, a patient care assistant at PowerMed. Like Barrera,

Pogue had been found guilty of conspiracy to defraud the SSA but acquitted of health care fraud. However, unlike Barrera, the jury found Pogue guilty of one count of theft of government funds. *See* 18 U.S.C. § 641. Pogue's PSR recommended that she, like Barrera, only be required to pay restitution for losses suffered by the SSA. As before, the Government objected to the PSR's recommendation and argued that Pogue should be required to pay restitution for the additional $203,907.62 in losses suffered by the private insurers. The district court overruled the Government's objection and ordered Pogue to pay $286,185.83 to the SSA and nothing to the private insurers.

## II.

Barrera argues that the district court erred in ordering her to pay restitution to the private insurers, clearly erred in calculating the restitution amounts, and abused its discretion in requiring her, but not Pogue, to pay restitution for the private insurer losses. We address these arguments in turn.

### A.

Barrera first argues that, because she was only convicted of conspiracy to defraud the SSA, it is the only entity to which she could be ordered to pay restitution. Thus, she argues, the district court erred in awarding restitution to the private insurers.

"This court reviews the district court's decision to award restitution for an abuse of discretion," *United States v. Karie*, 976 F.3d 800, 805 (8th Cir. 2020), and "[w]e review the district court's restitution calculation *de novo* as to legal conclusions," *United States v. Matheny*, 42 F.4th 837, 845 (8th Cir. 2022). "Restitution may be ordered only for the loss caused by the specific conduct that is the basis of the offense of conviction," *id.* (internal quotation marks omitted), "unless the offense of conviction 'involves as an element a scheme, conspiracy, or pattern of criminal activity,' in which case restitution may be ordered for any loss

-4-

caused 'by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern,'" *id.* at 845-46 (quoting 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2)). The "language in the [Mandatory Restitution Victims Act] reflects an intent to include the defendant's total conduct in committing the offense." *United States v. Cornelsen*, 893 F.3d 1086, 1090 (8th Cir. 2018) (internal quotation marks omitted). "As such, we have consistently held that restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, even if the defendant is not convicted for each fraudulent act in the scheme." *Id.* at 1090-91 (internal quotation marks omitted); *see United States v. Ross*, 210 F.3d 916, 924 (8th Cir. 2000). This is true "even if the loss isn't specifically listed in the indictment." *United States v. Miller*, 41 F.4th 1019, 1025 (8th Cir. 2022). In fact, if a person or entity is "one of the ultimate victims" of the defendant's "scheme," the defendant can be ordered to pay restitution even "after the jury acquitted [the defendant] of committing . . . fraud on the [victim]." *United States v. Farkas*, 935 F.2d 962, 967 (8th Cir. 1991).

Barrera was convicted of conspiracy to defraud the SSA, 18 U.S.C. § 371, a "statute of conviction" that "lists as an element a scheme, conspiracy, or pattern of criminal activity," *Matheny*, 42 F.4th at 846. Thus, "restitution may be ordered for any loss caused by [Barrera's] criminal conduct in the course of" the PowerMed disability benefits scheme. *Id.* at 845-46 (internal quotation marks omitted). For each patient, Barrera's criminal conduct began when she explained the disability package process—a combination of unnecessary medical care and fraudulent applications for short- and long-term disability benefits from private insurers, Social Security disability benefits, and ultimately the $100,000 life insurance payout.

Unnecessary medical treatments—which Barrera fraudulently billed to private health care insurers—established the requisite paperwork to make it appear as if patients had debilitating medical issues, or, in Barrera's words, "look[] really really good on your disability." Patients used this false paper trail to claim short-term disability benefits from private disability insurers. Barrera assisted patients in completing the paperwork and advised them on how to fraudulently obtain benefits, such as by warning that a patient was once rejected because he admitted he could

-5-

drive, and even though "[o]f course he drives[,] . . . you can't say 'drive'" because then "he can drive for his job." For an additional fee, PowerMed would then submit these fraudulent claims to the private insurers on the patients' behalf. The private disability insurance would, in Barrera's words, "keep you goin'" as patients applied for Social Security disability benefits. Once patients had been approved for Social Security disability benefits, PowerMed would submit their Social Security disability paperwork to Prudential Insurance, whereupon the patients would become eligible for early payout of the $100,000 life insurance policy. In addition to the life insurance payout, PowerMed's scheme allowed disability package patients to fraudulently receive, in Barrera's estimation, "like [$]100[,000] a year" indefinitely. Indeed, so linked were the private insurer and SSA sources of disability benefits that PowerMed "required if [a patient] was going to apply for long-term disability" from a private insurer "that [he] apply for Social Security Disability as well." After patients began receiving benefits, PowerMed required them to continue monthly unnecessary medical treatments until age 65. This was done so that PowerMed could continue providing fraudulent documentation to satisfy both the private insurers' annual reviews of their long-term disability claims and provide ongoing documentation to the SSA. Barrera was responsible for billing the private insurers for these ongoing unnecessary medical treatments.

Barrera's "criminal conduct in the course of the . . . [PowerMed] conspiracy," 18 U.S.C. § 3663A(a)(2), included defrauding both private health care and disability insurers as part and parcel of the scheme to defraud the SSA. Thus, the district court did not err in ordering her to pay restitution to the private insurers.

B.

Next, Barrera argues that the district court erred in calculating the amounts of restitution to be made to Prudential and MetLife. She asserts that trial testimony confirmed Prudential suffered only $75,086.30 in losses and MetLife only $38,020. These amounts align with the PSR's calculation of the losses suffered by Prudential and MetLife.

"Once the district court has identified a victim, it must determine 'the full amount of each victim's losses,' based on the amount of *actual* loss . . . ." *Karie*, 976 F.3d at 805 (quoting 18 U.S.C. § 3664(f)(1)(A)). "The district court has discretion to determine this amount depending on the circumstances of each case." *Id.* (internal quotation marks omitted). We review "the district court's . . . finding of the loss amount for clear error." *Id.* However, "[r]estitution orders are reviewed for plain error when the defendant does not preserve his challenge to the restitution order below." *United States v. Piggie*, 303 F.3d 923, 928 (8th Cir. 2002).

Our review here is hindered by an unclear record. The Government concedes on appeal that part of its restitution calculation was erroneous and that vacatur is necessary as to the $100,000 of restitution ordered to Prudential. Having done "additional research," it concedes that the amount should be $75,086.30, not $100,000. However, it also identifies a new victim—American General Life Insurance Company ("AIG") instead of Prudential, although it does not explain why AIG is the correct victim. Moreover, it is unclear whether the district court even knew when it ordered restitution of $100,000 to Prudential and $60,659 to MetLife that it was adopting the Government's restitution calculation as opposed to the PSR's calculation given that the Government erroneously told the district court that "in the presentence investigation report, the total amount [of private insurer losses] is $203,907.62." And it is unclear whether Barrera objected to the Government's restitution calculation since her counsel stated that he "agree[d] with the amount [of restitution] established in the presentence report" but did not later correct the Government's misstatement of the PSR's restitution calculation.

In light of this confusion, we affirm the district court's judgment as to the amounts of restitution to be made to Anthem, United, and Cigna, but vacate as to the amounts of restitution to be made to MetLife and Prudential or AIG. *See United States v. Frazier*, 651 F.3d 899, 906 (8th Cir. 2011) (concluding that when "[t]he record before us . . . is unclear" as to the amount of restitution that may be awarded to a particular victim, "a remand to the district court is appropriate"); *United States v. Woodring*, 35 F.4th 633, 635 (8th Cir. 2022) (remanding "for fact-finding" where

-7-

the appropriate restitution amount was unclear from the record); *Matheny*, 42 F.4th at 846. We remand for further proceedings to determine the amount, if any, of restitution due to MetLife and Prudential or AIG.

C.

Finally, Barrera argues that the district court abused its discretion in requiring her, but not Pogue, to pay restitution for the private insurer losses. *See Karie*, 976 F.3d at 805 (standard of review). Barrera argues that this created an unwarranted sentencing disparity and a substantively unreasonable sentence. *See* 18 U.S.C. § 3553(a)(6); *United States v. Baez*, 983 F.3d 1029, 1044 (8th Cir. 2020) ("We review the substantive reasonableness of a sentence under a deferential abuse-of-discretion standard.").

Barrera principally relies on *United States v. Lazenby*, 439 F.3d 928 (8th Cir. 2006). Although Barrera is correct that "[t]his court once granted relief based on a comparison of co-conspirators [in *Lazenby*], . . . that decision is necessarily limited to the unusual circumstances presented there: an extreme disparity in sentencing between similarly situated conspirators, and a consolidated appeal involving both conspirators that permitted a remand for resentencing of both parties." *United States v. Fry*, 792 F.3d 884, 892-93 (8th Cir. 2015); *see also United States v. McDowell*, 676 F.3d 730, 733 (8th Cir. 2012) ("*Lazenby* was premised on a method of analysis that the Supreme Court rejected . . . so its precedential value is suspect.").

Barrera's argument "founders on a mistaken premise." *United States v. Pierre*, 870 F.3d 845, 850 (8th Cir. 2017). "In attacking the reasonableness of [her] sentence[], [Barrera] . . . emphasize[s] the sentencing disparities with [her] co-conspirators." *United States v. Farah*, 899 F.3d 608, 616 (8th Cir. 2018). But as we have consistently explained, "the statutory direction to avoid unwarranted sentence disparities, *see* 18 U.S.C. § 3553(a)(6), refers to *national* disparities, not differences among co-conspirators." *Baez*, 983 F.3d at 1044; *see Farah*, 899 F.3d at 616-17; *Pierre*, 870 F.3d at 850; *Fry*, 792 F.3d at 892-93. Perhaps the district court erred by

not requiring Pogue to pay restitution to the private insurers.  But the Government chose not to appeal that ruling, and "[b]y itself, the fact that a similarly situated co-conspirator was sentenced differently provides no principled basis for an appellate court to say which defendant received the appropriate sentence."  *Baez*, 983 F.3d at 1044 (internal quotation marks omitted).  Thus, we reject Barrera's last argument.

## III.

For the foregoing reasons, we affirm the district court's judgment in part, including the district court's determination that Barrera is liable for restitution to the private insurers and the amounts of restitution to be made to Anthem, United, and Cigna, but we vacate as to the amounts of restitution to be made to MetLife and Prudential or AIG and remand for further proceedings.

_____